

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* RASHAD ZUBI, | QUI TAM COMPLAINT |
| Plaintiffs, | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |
| vs. | |
| UNITED CAPITAL INVESTMENT GROUP, INC., | JURY TRIAL DEMANDED |
| Defendant. | |

Plaintiff-Relator, RASHAD ZUBI ("Relator"), brings this *qui tam* action on behalf of the United States of America against Defendant, UNITED CAPITAL INVESTMENT GROUP, INC., under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and alleges and states as follows:

## I. OVERVIEW

1. Throughout the last several years, Defendant, United Capital Investment Group, Inc. ("UCIG"), engaged in a fraudulent scheme to overcharge the United States Government for petroleum products delivered within Djibouti and around the world and withheld overpayments it was not entitled to keep.

2. On February 1, 2018, UCIG won a contract award, contract number SPE605-18-D-1256, that was issued by the Defense Logistics Agency – Energy ("DLA Energy"). The estimated dollar value of the award was $245,577,878.38. This contract allowed for UCIG to procure and deliver petroleum contracts to the United States within Djibouti. The contract was composed of a "Base Reference Price" and an additional price per gallon (the bidder's margin or premium) that the contractor agreed to charge the United States for each gallon of petroleum product delivered.

1

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

3. UCIG similarly has obtained other DLA Energy contracts to provide petroleum products to the United States in other countries around the world.

4. Upon information and belief, UCIG committed fraud, and conspired to commit fraud, against the United States by inflating the "Base Reference Price" charged to the United States under contract number SPE605-18-D-1256 and/or by knowingly accepting and retaining overpayments it was not entitled to receive and keep.

5. When it sought payment from the United States, UCIG relied on DLA's pricing, but upon information and belief, the pricing that DLA used was significantly inflated and UCIG knew the pricing was inflated. Despite knowing that the payments were an overpayment, UCIG did not return the overpayments to the United States.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

7. This Court has personal jurisdiction over UCIG because Defendant does business and can be found within the Eastern District of Virginia.

8. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a) because UCIG can be found in, transacts business in, or has transacted business in this district. At all times relevant to this Complaint, UCIG regularly conducted, and continues to conduct, substantial business within this district by negotiating and entering into numerous contracts for the acquisition and transportation of petroleum products with the United States.

9. Relator has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

10. There are no bars to recovery under 31 U.S.C. §3730(e). Specifically, substantially the same allegations as those alleged in this suit have not been publicly disclosed in a federal criminal, civil, or administrative hearing in which the Government or its agents were a party, or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or from the news media. In the alternative, Relator is an original source as defined in 31 U.S.C. § 3730(e). Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions, and prior to filing this Complaint, Relator has voluntarily provided and disclosed all substantive information to the United States.

### III. PARTIES

11. Plaintiff is the United States of America.

12. Relator, Rashad Zubi, is a Canadian citizen who resides in Florida. He is the CEO of BRZ Investment & Consulting, LLC.

13. Defendant, UCIG, is a Virginia-based company with its principal place of business located at 8201 Greensboro Drive, Suite 300, McLean, VA 22102. It also has an address of 8200 Greensboro Drive, Suite 900, McLean, VA 22102.

14. UCIG's CAGE Code is 62VC7 and it initially registered with the System for Award Management on July 23, 2010. Its primary point of contract is Tommy Hakimi, who is also UCIG's President, CEO, and Executive Director. Mr. Hakimi is located at 9190 Marovelli Forest Drive, Lorton, VA 22079.

15. UCIG is an international private equity firm that operates across all segments in the petroleum industry, spanning across 5 continents and operating in over 150 countries.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## IV. THE LEGAL FRAMEWORK

### A. The Truth in Negotiations Act (TINA) and the Federal Acquisitions Regulation (FAR)

16. The Truth in Negotiations Act, 10 U.S.C. § 2306a ("TINA"), and the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 15.801, apply to all contracts, subcontracts, and contract modifications negotiated with the United States that exceed a certain dollar amount.[1] Both TINA and the FAR govern the contracts at issue here.

17. TINA and the FAR require a prospective contractor to provide during negotiations with the United States all relevant cost and pricing data, and to certify at the end of such negotiations that the cost and pricing data it submitted were "accurate, complete, and current" as of the date of certification. 10 U.S.C. § 2306a.

18. The intent of Congress in enacting TINA was to ensure that government contracting officers are provided with accurate and complete information relating to the prices being negotiated. S. Rep. No. 1884, 87th Cong., 2d Sess., reprinted in 1962 U.S. Code Cong. & Admin. News 2476, 2478. Congress intended to curb abuses of the procurement process and to avoid excessive contract costs which "result from a contractor having in [its] possession accurate, complete and current information when the Government does not possess the same data." *M-R-S Mfg. Co. v. U.S.*, 492 F.2d 835, 842 (Ct. Cl. 1974). The goal of TINA is to place the government negotiator and the contractor on an equal footing at the bargaining table, and "[t]he only way to

---

[1] The thresholds are: $2 million for contracts or modifications entered into after June 30, 2018 ($750,000 if before); and $750,000 "in the case of a change or modification made after July 1, 2018, to a prime contract that was entered into on or before June 30, 2018." 10 U.S.C. § 2306a(a)(1)(A).

4

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

further the purpose of the statute is to require complete disclosure of costs known to the contractor." *Id.*[2]

19. In addition, all contracts governed by the FAR must include a clause requiring contractors to "comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to [their] performance" under the contract. *See* 48 C.F.R. § 52.212-4(q).

20. TINA is such an applicable law.

21. Defendant had a statutory obligation under TINA to provide to the United States, during those negotiations, cost data that were "accurate, complete, and current," and to certify same when negotiations were concluded. 10 U.S.C. § 2306a(a)(2).

22. Under the FAR, Defendant also had an obligation to "comply with all applicable Federal, State and local laws, executive orders, rules and regulations" under the contract. *See* 48 C.F.R. § 52.212-4(q).

23. Defendant knowingly failed to comply with TINA, and therefore also knowingly failed to comply with its obligations under the FAR. These knowing failures were material to the United States' decision to award the contracts at issue herein.

**B.    The False Claims Act**

24. This is an action to recover damages and civil penalties on behalf of the United States arising from the false and/or fraudulent claims, statements, and acts of UCIG made and caused to be made in violation of the FCA.

25. The FCA prohibits any person from knowingly making, or causing to be made, a false or fraudulent claim for payment to the United States. 31 U.S.C. § 3729(a)(1)(A).

---

[2] This is particularly important where, as here, the fairness of a contractor's pricing is not tested by a competitive bidding process. *Cf. U.S. ex rel. Taxpayers Against Fraud v. Singer Co.,* 889 F.2d 1327, 1329 n.8 (4th Cir. 1989) (making the same point with regard to sole-source contracts).

5

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

26. The FCA also prohibits knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

27. In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States. 31 U.S.C. § 3729(a)(1)(G).

28. Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i).

29. A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the United States Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

30. The FCA defines the term "obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

31. A false or fraudulent claim under the FCA may take many forms, "the most common of which is a claim for payment for goods and services not provided or provided in violation of contract terms, specification, statute or regulation." S. Rep. No. 99-345, at 9 (1986).

32. The FCA defines the term "material" objectively, not subjectively, to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

33.   The FCA defines knowingly to include actual knowledge, reckless disregard, and deliberate ignorance. 31 U.S.C. § 3729(b)(1)(A). No specific intent to defraud need be shown. 31 U.S.C. § 3729(b)(1)(B).

## V.   FACTUAL ALLEGATIONS

### A.   Petroleum Products Background Information

34.   Petroleum prices continually change, and the international benchmark is known as the Platts Publication ("Platts"). DLA Energy commonly uses Platts price benchmarks when awarding petroleum purchase contracts.

35.   Within the contract at issue, Platts prices are fixed for one month based upon the average cost of petroleum products in the prior month.

36.   When the United States, through DLA Energy, solicits bids for petroleum[3] contracts, contractors submit bids using two pricing components: (a) a Base Reference Price representing the acquisition cost of the petroleum products based upon the pricing publication that DLA Energy requires to be used at the time of the specific contract; and (b) an additional fixed dollar amount per gallon of product.

37.   All bidders use the same "Base Reference Price" pricing publication as set by DLA Energy in what is known as the "Escalator Publication."

38.   The additional fixed cost component varies among bidders and is how bidders differentiate themselves from one another. This a fixed price per gallon the bidder/contractor charges the United States and agrees to accept throughout the duration of the contract. The contractor will try to set this charge so that it will cover the ancillary costs to deliver the products to the final destination, such as transportation and storage costs, and provide a profit.

---

[3] The terms petroleum, energy, oil, gas, diesel, and jet fuel are used generally and interchangeably throughout this Complaint. When a specific product is at issue, it will be noted.

7

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

39. The fixed price component is commonly called either the "bidder's margin" or "premium."

40. The bidder's margin or premium per gallon does not change throughout the duration of the contract.

41. Bidders are incentivized to keep their costs low to potentially increase their profit while simultaneously being able to submit a lower bidder's margin in their bids.

**B.   UCIG Contract Award**

42. UCIG was awarded Contract No. SPE605-18-D-1256, on February 1, 2018 (hereinafter referred to as the "1256 Contract"). The 1256 Contract was issued by DLA Energy at Fort Belvoir, Virginia.

43. The 1256 Contract required the Wide Area Workflow (WAWF) to be used for all invoicing and payments transactions.

44. The WAWF pulls pricing from "Prices to Web – DLA Energy Tool" ("Prices to Web Tool").[4] The Prices to Web Tool is published by the DLA and used by vendors to see the fuel price that is in effect for a given delivery date under a specific contract, order, and CLIN.

45. The Prices to Web Tool automatically populates the Base Reference Price plus the bidder's margin/premium. Thus, the unit price reflected on DLA's Prices to Web tool is the total amount to be paid to the contractor per gallon of product delivered.

46. When UCIG submitted invoices using the DLA's Prices to Web established prices, it would have known the DLA pricing provided was far in excess (oftentimes, double or triple) what the actual petroleum acquisition costs were. Yet, UCIG submitted the invoices and received payments.

---

[4] https://cis.energy.dla.mil/prices/PricesServlet?class=reportfilteroptions&method=showReportOptions.

8

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

47.     FAR 52.212-4, which was expressly incorporated into the 1256 Contract, sets forth the requirements of a proper invoice for payment, including, but not limited to, the contractor's name, invoice date and number, contract number, line item number, unit price and extended price of the items delivered. UCIG should have invoices reflecting what its acquisition costs were such that any overpayments made by DLA to UCIG would be able to be discovered.

48.     The 1256 Contract expressly incorporates FAR 52.212-4 and FAR 52-212.5, which describe, in part, how invoicing must be prepared and presented to the Government for payment, and it require that the contractor comply with all applicable Federal, State, and local laws, executive orders, rule and regulations applicable to its performance under this contract.

49.     Contract Line-Item Number (CLIN) Awards 0001, 0002 and 0013 of the 1256 Contract are for transportation and delivery of petroleum products to Camp Lemonier, located in Djibouti. CLINs 0004 and 0005 are for transportation and delivery of petroleum products to Chabelley Airfield, also located in Djibouti.

50.     UCIG agreed to deliver to the United States within Djibouti both diesel (referred to as "DF2") and jet aviation fuel with additives (referred to as "JP8"). The agreed to pricing at the time of the original 1256 Contract award was:

| Item | Product | Quantity | Base Ref. Price | Award Price | Total (USD) |
|---|---|---|---|---|---|
| 0001 | DF2 | 20,803,000 gal. | $1.505727 | $1.655700 | $34,443,527.10 |
| 0002 | DF2 | 5,841,000 gal. | $1.505727 | $1.655700 | $9,670,943.70 |
| 0004 | JP8 | 5,851,000 gal. | $1.488408 | $1.733900 | $10,145,048.90 |
| 0005 | DF2 | 1,979,262 gal. | $1.505727 | $1.655700 | $3,227,064.09 |
| 0013 | JP8 | 91,499,999 gal. | $1.488408 | $1.733900 | $158,651,848.27 |
|  |  |  |  | **Total** | **$216,138,432.06** |

51.     The difference between the "Award Price" and the "Base Reference Price" is the fixed cost per gallon (the bidder's margin or premium) that UCIG agreed to charge the United States.

9

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

52. For example, the Base Reference Price assigned to CLIN 0001 was $1.505727 and UCIG's winning bid included an offer of $1.655700 per gallon. For CLIN 0001, UCIG therefore included bidder's margin or premium per gallon of diesel in the amount of $0.149973. Thus, for every gallon of DF2 (diesel) UCIG delivered to the United States under CLIN 0001, UCIG would charge the United States the "Base Reference Price" plus an additional $0.149973 per gallon.

53. The Base Reference Price is the cost to acquire the fuel products per gallon based on the pricing publication that DLA assigned for the contract. The Base Reference Date was May 1, 2017.

54. Under the 1256 Contract, the Base Reference Price would change monthly due to the monthly changes in fuel prices, but the bidder's margin or premium was fixed.

55. Each of the awarded amounts for the above-reference CLINs have Base Reference Prices based on a specific pricing publication. A pricing publication is known as the "Escalator Publication" within the contract.

56. Initially, the 1256 Contract utilized the following Escalator Publications for CLINS 0001, 0002, 0004, 0005, and 00013:

| Item | Escalator |
|------|-----------|
| 0001 | PMARBGFGO - PM AG GASOIL.05% (500PPM) FOB CARGO |
| 0002 | PMARBGFGO - PM AG GASOIL.05% (500PPM) FOB CARGO |
| 0004 | PMARBGFJET- PLATTS ARAB GULF MONTHLY PJAAAOO |
| 0005 | PMARBGFGO - PM AG GASOIL.05% (500PPM) FOB CARGO |
| 0013 | PMARBGFJET- PLATTS ARAB GULF MONTHLY PJAAAOO |

The acronyms for the escalators are explained as follows:

- PM = Platts Monthly
- ARBGFGO = Arab Gulf Gas Oil
- ARBGFJET = Arab Gul Jet Oil

57. These Escalator Publications are all based on Platts pricing benchmarks.

10

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

### C. DLA Energy Modifies the 1256 Contract by Changing how the "Base Reference Price" is Calculated

58. On June 1, 2018, the 1256 Contract was modified. The Modification provides that "this contract's original escalator publication is being changed." The Modification then changed the Escalator Publication from Platts publication pricing to the "SIHD Official Djiboutian Publication."

59. The referenced "SIHD Official Djiboutian Publication" is a monthly price index, issued by the Directeur de la Société Internationale des Hydrocarbures ("SIHD"), for all fuel to be sold and transported throughout Djibouti. The publication sets out the monthly prices for three types of fuel sold to the United States Government, on listings titled "Armée américaine": (a) Super (gasoline); (b) Jet A1 (jet aviation fuel); and (c) Gasoil (diesel). The SIHD prices are listed per liter[5] and priced in the Djibouti franc.[6]

60. Thus, the Base Reference Prices for CLINS 0001, 0002, 0004, 0005 and 0013 were to be the price officially published by the government of Djibouti in the SIHD publications. The new Base Reference Prices were:

| Item | Product | Quantity | Base Price | New Total (USD) | Difference (USD) |
|---|---|---|---|---|---|
| 0001 | DF2 | 20,803,000 gal. | $3.2262 | $67,114,638.60 | $32,671,111.50 |
| 0002 | DF2 | 5,841,000 gal. | $3.2262 | $18,844,234.20 | $9,192,134.80 |
| 0004 | JA1 | 5,851,000 gal. | $3.3768 | $19,757,656.80 | $9,612,607.9 |
| 0005 | DF2 | 1,979,262 gal. | $3.2262 | $6,385,495.07 | $3,158,430.97 |
| 0013 | JA1 | 91,499,999 gal. | $3.3768 | $308,977,196.62 | $158,651,848.27 |
| | | | Total | $421,079,221.29 | $213,286,133.44 |

61. The modification was a retroactive Economic Price Adjustment, effective as of March 1, 2018.

---

[5] The liter-to-gallon conversion is 3.75841 liters to one gallon.
[6] At all relevant times, the exchange rate for 1 DJF fluctuated between its lowest point of $0.005565 USD (on April 18, 2022) and its highest point of $0.005667 USD (on April 11, 2018). The applicable daily exchange rates are used throughout this Complaint.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

62. This retroactive adjustment resulted in an almost 100% price increase to the United States Government for the transportation and distribution of petroleum products within Djibouti.

63. While the June 1, 2018, modification changed the pricing publication for determining the Base Reference Price, the modification did not change UCIG's fixed price per gallon (bidder's margin).

64. As modified, the 1256 Contract utilized SIHD pricing. SIHD pricing is not significantly different than Platts benchmarking, but includes some additional expenses charged by the Djibouti government, such as transportation, administrative costs, storage, taxes, etc.

65. So long as UCIG charged the United States the Base Reference Price based on true and accurate SIHD pricing, UCIG would be compliant.

66. Upon information and belief, DLA Energy relied on inflated SIHD pricing information it received from UCIG. As such, when setting the Base Reference Price, DLA Energy used an inflated acquisition cost per gallon, which allowed for UCIG to obtain significantly greater payments than it was entitled to receive.

67. The prices charged to the United States by UCIG far exceeded the true and accurate SIHD prices such that UCIG was knowingly accepting overpayments.

68. UCIG knowingly retained overpayments that it was not allowed to retain since it knew that DLA's pricing was significantly inflated. Such retention of overpayments violates FAR 52.212-4, which is incorporated into the 1256 Contract. Additionally, under the FCA, this constitutes an "obligation" owing to the United States.

69. Relator is aware of the costs of petroleum products in Djibouti and alleges that in the last three years alone, UCIG has likely received several hundred million dollars in overpayments.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

70. The cost of petroleum products charged to the United States is available for viewing on a contract-by-contract basis utilizing the Prices to Web Tool.[7]

71. Relator obtained information pertaining to the 1256 Contract CLIN 0004 (the same prices were in effect for CLIN 0013) via the Prices to Web Tool, which provided the following:

- On February 1, 2018, the price of JP8 is listed at $2.138944 per gallon.

- By April 1, 2018, this price had decreased to $2.084936 per gallon.

- Beginning on June 1, 2018, the price increased significantly to $3.622292 per gallon.

- By January 27, 2019, the price increased to $4.496482 per gallon.

- On March 21, 2022, the price increased to $6.294995 per gallon, where it remained through January 30, 2023.[8]

72. Yet, during these time periods, the actual cost of jet fuel was significantly less according to either Platts benchmarks or SIHD pricing.

73. Upon information and belief, DLA relied on false and/or fraudulent SIHD pricing, provided by UCIG, when determining the Base Reference Price for the 1256 contract.

74. The following table shows: (a) what UCIG should have charged the United States Government per gallon; (b) what UCIG actually charged the United States Government per gallon; and (c) the per-gallon difference between the two prices on January 27, 2019, and August 16, 2020, using the official SIHD publications (rounded to 6 decimals):

| Date | Product | CLIN | Published SIHD Base Rate | UCIG Fixed Rate | Total SIHD Rate | UCIG Billed Rate | Difference (per gal.) |
|---|---|---|---|---|---|---|---|
| 01/27/19 | JP8 | 0004 | $2.155682 | $0.245492 | $2.401173 | $4.496482 | $2.095309 |
| 01/27/19 | DF2 | 0001 | $2.228501 | $0.149973 | $2.378474 | $4.299753 | $1.921279 |
| 08/16/20 | JP8 | 0004 | $1.619156 | $0.245492 | $1.864648 | $4.496482 | $2.631834 |
| 08/16/20 | DF2 | 0001 | $1.860329 | $0.149973 | $2.010302 | $4.299753 | $2.289451 |

---

[7] *See* ¶¶ 44-45, above.
[8] Some of these price increases happened during the COVID-19 pandemic when there was a substantially decreased demand for petroleum products around the world, which reduced the acquisition costs of energy products.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

75. The January 27, 2019, published SIHD rate per liter of diesel was 105.58 DJF. Multiplying this by 3.75841 (the conversation from liters into gallons) indicates the price per gallon of diesel was 396.81 DJF. The exchange rate in effect on January 27, 2019, was 1 DJF for $0.005616 USD,[9] meaning that the delivery price per gallon of diesel was $2.228501 (rounded to 6 digits).

76. UCIG's contract with the United States established UCIG's fixed cost per gallon of diesel delivered under CLIN0001 at $0.149973.

77. UCIG should have charged the United States $2.378474 (rounded to 6 digits) per gallon of diesel delivered under CLIN0001 during January 2019. Rather, it charged the United States $4.299753, which is $1.921279 more per gallon of diesel – almost double what it should have charged.

78. Upon information and belief, DLA relied on incorrect SIHD pricing when it established the Base Reference Price.

79. The following table exemplifies how much UCIG overcharged and/or retained overpayments from the United States Government for petroleum products on the 1256 Contract[10]:

---

[9] https://www.exchange-rates.org/exchange-rate-history/djf-usd-2022.
[10] CLIN0013 was replaced by CLIN0028 in a modification dated October 4, 2018.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

| Date | Prod. | CLIN | SIHD Base Rate | UCIG Fixed Rate | Published SIHD Rate | UCIG Billed Amount | Difference (per gal.) |
|---|---|---|---|---|---|---|---|
| 11/30/19 | DF2 | 0001 0002 0005 | $2.392301 [11] | $0.149973 | $2.542274 | $4.299753 | $1.757479 |
| 08/30/20 | DF2 | 0001 0002 0005 | $1.859667 | $0.149973 | $2.009640 | $4.299753 | $2.290113 |
| 01/31/21 | DF2 | 0001 0002 0005 | $1.966911 | $0.149973 | $2.116884 | $4.299753 | $2.182869 |
| 07/30/21 | JP8 | 0004 0013 | $2.356819 | $0.245492 | $2.602311 | $4.496482 | $1.894171 |
| 12/03/21 | DF2 | 0001 0002 0005 | $2.924941 | $0.149973 | $3.074914 | $4.299753 | $1.224839 |
| 03/31/22 | DF2 | 0001 0002 0005 | $3.318388 | $0.149973 | $3.468361 | $6.114272 | $2.645911 |
| 10/04/22 | JP8 | 0004 0028 | $4.117376 | $0.245492 | $4.362868 | $6.294995 | $1.932127 |
| 01/30/23 | DF2 | 0001 0002 0005 | $3.258212 | $0.149973 | $3.408185 | $6.114272 | $2.706087 |
| 01/30/23 | JP8 | 0004 0028 | $3.567763 | $0.245492 | $3.813256 | $6.294995 | $2.481739 |

80. By way of further example, there are hundreds of postings for DF2 pertaining to CLIN 0001 from November 30, 2019, through December 3, 2020, wherein the amount that UCIG billed the United States Government remained a constant and continual $4.299753 despite the varying SIHD prices in that timespan. This implies DLA was using outdated SIHD pricing when it established the Base Reference Price during this time period.

---

[11] 113.30 DJF per liter per the applicable SIHD. Multiply this amount by 3.75841 to get 425.827853 per gallon. Converting this into US dollars utilizing the January 31, 2021, exchange rate of $0.005618 USD, gives you a total of $1.859667 per gallon of DF2. This same calculation utilizing the applicable daily rates is performed for each of these examples.

15

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

81. By comparing the difference per gallon between the published SIHD rates and the amount invoiced by UCIG, it is clear that the Base Reference Price established by DLA Energy was significantly inflated during the time period UCIG was performing in Djibouti.

82. Throughout this time period, UCIG had knowledge of its petroleum acquisition costs, which were significantly lower than what the United States was paying.

83. Upon information and belief, UCIG knowingly failed to disclose accurate pricing data to DLA Energy when DLA Energy established the Base Reference Price for the 1256 contract.

84. Alternatively, if UCIG did not provide inaccurate SIHD pricing data to DLA Energy, UCIG knowingly retained overpayments since the Base Reference Price was inflated when UCIG submitted invoices for payment and retained those payments.

85. Relator believes that UCIG is committing this same fraud in other countries that utilize their own standard price indices instead of Platts benchmarking.

86. UCIG submitted thousands of invoices for payment related to CLINS 0001, 0002, 0004, 0013, and 0028 throughout the duration of the 1256 Contract and these invoices were inflated due to the Base Reference Price being incorrect.

## FIRST CLAIM FOR RELIEF
### (FALSE CLAIMS – 31 U.S.C. § 3729(a)(1)(A))

87. The allegations in paragraphs 34-86 of this Complaint are incorporated by reference.

88. UCIG had a statutory obligation under TINA to provide to the United States cost data for the contracts at issue that were "accurate, complete, and current," and to certify same when negotiations were concluded. 10 U.S.C. § 2306a(a)(2).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

89. Under the FAR, UCIG also had an obligation to "comply with all applicable Federal, State and local laws, executive orders, rules and regulations" under the contract. *See* 48 C.F.R. § 52.212-4(q).

90. UCIG knowingly failed to comply with TINA, and therefore also knowingly failed to comply with its obligations under the FAR. These knowing failures were material to the United States' decision to award the contracts at issue herein.

91. As described above, UCIG, by and through its own acts, or through the acts of its agents, servants, officers, and/or employees, knowingly presented and/or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

92. As a result of UCIG's fraudulent conduct, the United States Government has been damaged in amounts to be determined at trial.

93. The United States is entitled to maximum civil penalties for each and every violation of 31 U.S.C. §3729(1)(A) by UCIG, plus three times the amount of damages which the Government has sustained because of the acts of UCIG, together with all other damages and relief allowed by law.

### SECOND CLAIM FOR RELIEF
### (FALSE STATEMENTS – 31 U.S.C. § 3729(a)(1)(B))

94. The allegations in paragraphs 34-86 of this Complaint are incorporated by reference.

95. As described above, UCIG, by and through its own acts, or through the acts of its agents, servants, officers, and/or employees, knowingly made, used, and/or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved in violation of 31 U.S.C. § 3729(a)(1)(B).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

96. As a result of UCIG's fraudulent conduct, the United States Government has been damaged in amounts to be determined at trial.

97. The United States is entitled to maximum civil penalties for each and every violation of 31 U.S.C. § 3729(1)(B) by UCIG, plus three times the amount of damages which the Government has sustained because of the acts of UCIG, together with all other damages and relief allowed by law.

### THIRD CLAIM FOR RELIEF
### (REVERSE FALSE CLAIM – 31 U.S.C. § 3729(a)(1)(G))

98. The allegations in paragraphs 34-86 of this Complaint are incorporated by reference.

99. As described above, UCIG, by and through its own acts, or through the acts of its agents, servants, officers, and/or employees, improperly avoided an obligation to pay or transmit money to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

100. As a result of UCIG's fraudulent conduct, the United States Government has been damaged in amounts to be determined at trial.

101. The United States is entitled to maximum civil penalties for each and every violation of 31 U.S.C. § 3729(1)(G) by UCIG, plus three times the amount of damages which the Government has sustained because of the acts of UCIG, together with all other damages and relief allowed by law.

### PRAYER FOR RELIEF

**WHEREFORE**, Relator RASHAD ZUBI, on behalf of himself and the United States Government, prays as follows:

1. That for violations of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, this Court enter Judgment against UCIG in an amount equal to three times the amount of damages the

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

United States Government has sustained because of UCIG's actions, plus a civil penalty for each action in violation of 31 U.S.C. § 3729;

2. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) including the costs and expenses of this action and reasonable attorneys' fees;

3. That a trial by jury be held on all issues; and

4. That the United States Government and Relator, RASHAD ZUBI, receive all relief, both in law and equity, to which they reasonably are entitled.

**UNDER FEDERAL RULE OF CIVIL PROCEDURE 38, RELATOR DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this ___ day of April:

*Counsel for Relator*

**DENTON LAW, PC** (local counsel)

By: */s/ Jeremiah A. Denton IV*
Jeremiah A. Denton IV
jake@denton.law
3330 Pacific Avenue, Suite 403 B
Virginia Beach, VA 23451
(757) 678-8508 (phone)
(757) 551-2444 (fax)

**KATERS & GRANITZ, LLC**

By: */s/ Timothy Granitz*
Timothy Granitz
   (pro hac vice application to be filed)
tgranitz@katersgranitz.com
8112 West Bluemound Road, Suite 101
Milwaukee, WI 53213
(414) 600-0110 (phone)
(414) 600-9551(fax)

**BROWN, LLC**

By: */s/ Patrick S. Almonrode*
Patrick S. Almonrode
patalmonrode@jtblawgroup.com
Jason T. Brown
jtb@jtblawgroup.com
   (pro hac vice applications to be filed)
111 Town Square Place, Suite 400
Jersey City, NJ 07310
(201) 630-0000 (phone)
(855) 582-5297 (fax)